**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **BYRON E. ADAMS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 3:21-CV-748-MAB** |
| ) | |
| **DENNIS LARSON and LATOYA** ) | |
| **HUGHES,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Presently before the Court is a motion for summary judgment filed by Defendant Dr. Dennis Larson (Doc. 139), along with several related motions filed by Dr. Larson and Plaintiff Byron Adams (Docs. 137, 148, 149, 156, 160, 161). For the reasons set forth below, Dr. Larson's motion for summary judgment is GRANTED (Doc. 139), and the other related motions are DENIED as MOOT (Docs. 137, 148, 149, 156, 160, 161).

### PROCEDURAL AND FACTUAL BACKGROUND

On June 29, 2021, Plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983 (Doc. 1). Plaintiff's Complaint alleges that Defendants refused to continue his special diabetic diet and to permit him to have two pillows and two mattresses upon his transfer to Big Muddy River Correctional Center ("Big Muddy") (Doc. 1; Doc. 15).

Plaintiff is a diabetic inmate who was formerly housed at Stateville Correctional Center ("Stateville") (Doc. 15 at p. 2). At Stateville, Plaintiff received a special diabetic diet, twice-daily insulin, and numerous other medications (*Id.*). In addition, Plaintiff was

permitted to have two pillows and two mattresses because of his bilateral cataract surgery and back pain (*Id.*).

In January 2020, Plaintiff was transferred to Big Muddy (*Id.*). Shortly after arriving at Big Muddy, Plaintiff met with Dr. Larson to discuss his medical file (*Id.*). As alleged by Plaintiff, Dr. Larson informed Plaintiff that he could not continue Plaintiff's treatment regime or renew Plaintiff's permit for two pillows and mattresses because "the Administration" would not authorize it (*Id.*). Subsequently, Dr. Larson ordered imaging of Plaintiff's back and diagnosed him with arthritis (*Id.*). Dr. Larson also prescribed Plaintiff muscle relaxers and pain medication (acetaminophen 325mg), but they did not adequately alleviate Plaintiff's pains (*Id.*).

Following a threshold review of Plaintiff's complaint pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on two claims:

> **Count 1**:    Eighth Amendment claim against Larson for denying Plaintiff adequate medical care for his diabetes, back pain and cataract recovery; and

> **Count 2**:    [Americans with Disabilities Act and/or Rehabilitation Act] claim against [the IDOC Director] for failing to adequately accommodate his diabetes, back pain and cataract recovery.

(*Id.* at pp. 3-4).

After this matter moved beyond the exhaustion of administrative remedies stage, Plaintiff filed a motion seeking a mediation or settlement conference with Defendants Larson and Latoya Hughes[1] (Doc. 122). While Defendant Hughes was amenable to

---

[1] Pursuant to Federal Rule of Civil Procedure 25, Defendant Latoya Hughes was automatically substituted for Defendant Jeffreys because Defendant Hughes is the successor of Defendant Jeffreys, who was sued in his official capacity (*see* Doc. 133).

mediation, Dr. Larson responded that he did not believe mediation or settlement would be fruitful (Doc. 127). Accordingly, a mediation was conducted solely between Plaintiff and Defendant Hughes (Doc. 128). That mediation proved to be successful and resulted in a settlement between Plaintiff and Defendant Hughes (Docs. 132, 133).

Thereafter, Plaintiff filed a motion again requesting a settlement conference with Dr. Larson (Doc. 137). Roughly one week later, on May 3, 2024, Dr. Larson filed the instant motion for summary judgment (Doc. 139) and supporting memorandum (Doc. 140). Plaintiff filed an affidavit (Doc. 143) and response in opposition on May 15, 2024 (Doc. 144). Dr. Larson then filed a reply in support on May 23, 2024 (Doc. 146). Plaintiff filed another response in opposition six days later (Doc. 147). On June 5, 2024, Dr. Larson filed a motion to strike Plaintiff's second response (Doc. 148). On that same day, Plaintiff filed a motion to have a witness called to testify, purportedly to support his argument opposing Dr. Larson's motion for summary judgment (Doc. 149). Finally, after the Court had taken this matter under advisement, Plaintiff filed three motions for status, generally inquiring into the status of the pending motions in this case and his settlement payment with Defendant Hughes (*see* Docs. 156, 160, 161).

<u>DISCUSSION</u>

I.    <u>Summary Judgment Standard</u>

"Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.'" *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010) (quoting FED. R. CIV. P. 56(c)). "A

genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Substantive law determines which facts are considered material. *See Jaranowski v. Indiana Harbor Belt R.R. Co.*, 72 F.4th 744, 749 (7th Cir. 2023). Moreover, although a non-movant receives the benefit of conflicting evidence and reasonable inferences, he or she is still required to produce evidence sufficient to establish the essential elements of his or her claims. *Jackson v. Sheriff of Winnebago County, Illinois*, 74 F.4th 496, 500 (7th Cir. 2023).

II.    <u>Dr. Larson's Motion for Summary Judgment (Doc. 139)</u>

Dr. Larson argues that he is entitled to summary judgment because the evidence does not demonstrate that he was deliberately indifferent to any of Plaintiff's objectively serious medical conditions (*see generally* Doc. 140). Meanwhile, Plaintiff contends that Dr. Larson was deliberately indifferent in treating: (1) his diabetes; (2) his back pain; and (3) his eyes (*see generally* Doc. 144). More specifically, Plaintiff avers that Dr. Larson's deliberate indifference is evinced by Dr. Larson's failure to provide the same care to Plaintiff that he was given at prior facilities and Dr. Larson's inadequate explanations as to why he did not give Plaintiff the treatment he requested (*Id.*).

Under the Eighth Amendment, prison officials "must provide humane conditions of confinement" by, among other things, "ensur[ing] that inmates receive adequate food, clothing, shelter, and medical care[.]" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Thus, in the prison medical context, prison officials must provide healthcare to incarcerated persons who cannot obtain healthcare on their own. *See Howell v. Wexford Health Sources,*

*Inc.*, 987 F.3d 647, 653 (7th Cir. 2021). "To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016); *see also King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (explaining that the first element is objective while the second element is subjective); *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (same).

In order to satisfy the first, objective element, "[a] medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013) (quoting *Gomez v. Randle,* 680 F.3d 859, 865 (7th Cir. 2012)). Meanwhile, to satisfy the second, subjective element, a prison official acts with deliberate indifference only when he "actually [knows] of and disregard[s] a substantial risk of harm." *Brown*, 38 F.4th at 550 (internal quotation marks and citation omitted). In making this determination, courts must examine the totality of an inmate's medical care. *See Dunigan by Nyman v. Winnebago Cty.*, 165 F.3d 587, 591 (7th Cir. 1999). Moreover, "[w]hen a medical professional acts in his professional capacity, he may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *McGee*, 721 F.3d at 481 (internal quotation marks and

citation omitted). "[M]edical malpractice does not become a constitutional violation
merely because the victim is a prisoner." *Brown*, 38 F.4th at 550.

      a. *Plaintiff's Diabetes*

Dr. Larson concedes that Plaintiff's diabetes constitutes an objectively serious
medical condition (Doc. 140 at p. 11). However, Dr. Larson contends that the record
demonstrates he took numerous steps to treat Plaintiff's diabetes and any further
challenges by Plaintiff are really just challenges to his prescribed course of treatment, to
which he is entitled deference (*Id.* at p. 13). The Court agrees with Dr. Larson.

Viewed in its entirety, the record demonstrates that Plaintiff had numerous visits
with Dr. Larson following his arrival at Big Muddy and continuing past his filing of this
action (*see, e.g.* Doc. 140-5 at pp. 27-28). In addition, Plaintiff testified to having seen Dr.
Larson at least once every three months at his diabetes clinic (*Id.* at pp. 31-32).
Furthermore, medical records demonstrate that Dr. Larson increased Plaintiff's insulin
dosage and prescribed numerous other medications to treat his diabetes (*see, e.g.*, Doc.
140-3 at pp. 61-66; Doc. 140-1 at p. 4). Dr. Larson also ordered Plaintiff diabetic shoes, a
wheelchair, and a cane for the treatment of his diabetes (Doc. 140-5 at p. 34).
Consequently, the record demonstrates that Dr. Larson provided significant treatment to
Plaintiff for his serious medical condition of diabetes.

Ultimately, Plaintiff's underlying contention is not that Dr. Larson provided him
with no treatment, but rather that Dr. Larson failed to provide him with the course of
treatment Plaintiff believes would have been most effective – a diabetic diet. However,
Dr. Larson comprehensively described his reasoning for not prescribing such a diet.

Namely, Dr. Larson explained that a special diabetic diet was not medically necessary because the standard diet served at Big Muddy is designed by registered dietitians and is healthy and nutritionally complete (Doc. 140-1 at p. 5). Moreover, Dr. Larson believed, in his professional opinion, that Plaintiff's diabetes was better managed by a combination of medications, regular monitoring, increased physical activity, and certain physical accommodations, all of which he provided to Plaintiff (*Id.* at p. 6).

The Seventh Circuit dealt with a nearly identical challenge in *Williams v. Hartz*, 43 F. App'x 964 (7th Cir. 2002). In that case, an inmate sued a prison physician for denying his request to be given a special diabetic diet. *Id.* at 965. In holding that the physician defendant was entitled to summary judgment, the Seventh Circuit stated:

> Although diabetes is a serious medical condition, Williams failed to demonstrate a genuine issue of material fact regarding Hartz's treatment of the disease. Hartz regularly monitored Williams's blood sugar level, placed him on insulin, instructed him on what foods he should be eating, and when necessary gave him "diabetic snacks" to raise his blood sugar level. Moreover, the medical records reveal that Williams's health was jeopardized by his own recalcitrance—he frequently disregarded dietary instructions and often refused to submit to blood tests or take insulin. In light of this medical history, Hartz believed that placing Williams on a special diet would endanger his health, not improve it. Although Williams contends that this decision caused him harm, his mere disagreement with Hartz's medical judgment cannot sustain a claim of deliberate indifference. *See Estelle v. Gamble,* 429 U.S. 97, 107 (1976); *Snipes v. DeTella,* 95 F.3d 586, 591 (7th Cir. 1996). In any event Williams has offered no evidence that Hartz's refusal to place Williams on a special diet reflected a conscious disregard to his well being. Moreover, Williams failed to present any medical evidence to rebut the physician's view that a special diet would jeopardize his health—his personal disagreement with the diagnosis and his generalized statements about diabetes are insufficient to defeat summary judgment.

*Id.* at 966. Here, as in *Williams*, Plaintiff has provided no medical evidence to rebut Dr. Larson's opinion that a diabetic diet would not benefit Plaintiff. *Id.* Similarly, Dr. Larson's treatment of Plaintiff is almost identical to the treatment offered by the doctor in *Williams*, which the Seventh Circuit approved. *Id.* Moreover, Dr. Larson has also provided evidence demonstrating that Plaintiff was ignoring his dietary advice by making ill-advised commissary purchases (Doc. 140-1 at p. 6; Doc. 141).

Accordingly, Plaintiff has failed to demonstrate that Dr. Larson's course of treatment rises above the level of medical malpractice and represents cruel and unusual punishment. *See Estelle*, 429 U.S. at 107. At most, Plaintiff has provided some evidence indicating that physicians at other prisons prescribed him a diabetic diet (Doc. 140-5 at p. 30). Quite simply, evidence of what another physician did at a different prison with different food offerings is insufficient to demonstrate that Dr. Larson was deliberately indifferent in his treatment of Plaintiff.[2] "Plaintiff's evidence shows that a therapeutic diet was another potential treatment option and perhaps it would have been beneficial. But Plaintiff's dissatisfaction with the prescribed course of treatment is insufficient to create

---

[2] Admittedly, Plaintiff has also argued and testified that Dr. Larson told him the administration would not authorize a permit for diabetic meals (*see* Doc. 140-5 at p. 30). However, even if Dr. Larson made such a statement to Plaintiff, this does not impact the Court's analysis because the evidence in the record demonstrates that Dr. Larson provided Plaintiff with a medically acceptable course of treatment (*see, e.g.*, Doc. 140-1 at p. 6). Moreover, Plaintiff has argued not only that Dr. Larson made such a statement, but also that it is true and "the Administration would not allow [Dr. Larson] to give [him] a diet meal (Doc. 144-1 at p. 8). Even if the Court were to assume Plaintiff's claims were true, it would be improper to find that Dr. Larson was deliberately indifferent for failing to issue a permit that he was precluded from issuing based upon factors outside of his control, such as an administrative prohibition. *See Walker v. Benjamin*, 293 F.3d 1030, 1036 (7th Cir. 2002) ("An affidavit from a hospital administrator showed that Dr. Ansari could not expedite Walker's physical removal from prison to the hospital, and thus any delay was due not to deliberate indifference but to factors outside Dr. Ansari's control."); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019) ("[W]e can only hold Dr. Obaisi liable if he had control over the circumstances that caused the delays.").

a genuine question of material fact as to whether [the doctor] was deliberately indifferent." *Miller v. Baldwin*, No. 3:17-CV-859-MAB, 2020 WL 7027489, at *16 (S.D. Ill. Nov. 30, 2020), *aff'd sub nom. Miller v. Wexford Health Sources, Inc.*, No. 20-3533, 2022 WL 3928519 (7th Cir. Aug. 31, 2022).[3]

b. *Plaintiff's Back Pain*

Plaintiff also claims that Dr. Larson was deliberately indifferent to his back pain (*see generally* Doc. 144).[4] Dr. Larson counters that he took an appropriate course of action to treat Plaintiff's back pain and Plaintiff is really challenging his refusal to issue Plaintiff a double mattress permit (Doc. 140 at pp. 15-17). The Court finds Dr. Larson's argument to be persuasive.

Here, the record demonstrates that Dr. Larson took numerous steps to treat Plaintiff's back pain. After Plaintiff complained of his back pain, Dr. Larson ordered an ultrasound of Plaintiff's back (Doc. 140-2 at p. 14). Dr. Larson then obtained approval for Plaintiff to receive a biopsy of the injured area of his back (*Id.* at p. 18). After an outside doctor determined that a biopsy was unnecessary (*Id.* at p. 20), Dr. Larson continued to monitor Plaintiff's back pain (*Id.* at p. 22). Dr. Larson subsequently ordered another ultrasound, which confirmed that Plaintiff's condition was due to a lipoma[5] (*Id.* at p. 32;

---

[3] Dr. Larson also argues that Plaintiff has not presented any evidence tending to demonstrate that he was harmed by not receiving a diabetic diet (Doc. 140 at p. 15). Because the Court finds Plaintiff has failed to demonstrate that Dr. Larson was deliberately indifferent in his treatment of Plaintiff, the Court does not reach this issue.

[4] Plaintiff alleges that his back pain was due to both lipoma and arthritis (*see generally* Doc. 147). For purposes of this Order, the Court will assume – without actually reaching a decision on the issue – that Plaintiff's back pain constituted an objectively serious medical condition.

[5] As explained in Dr. Larson's affidavit, a lipoma is a non-cancerous lump consisting of fat tissues that is generally harmless and requires no special treatment (Doc. 140-1 at p. 2). *See also* Lipoma, WEBMD, *https://www.webmd.com/skin-problems-and-treatments/what-is-a-lipoma* (last visited Nov. 4, 2024).

Doc. 140-1 at p. 3). As a result, Dr. Larson prescribed Plaintiff aspirin to help with Plaintiff's discomfort (Doc. 140-1 at p. 3).

Similar to Plaintiff's claim about Dr. Larson's treatment of his diabetes, Plaintiff's true complaint is that Dr. Larson refused to issue him a double mattress permit, even though he was allegedly issued one at his prior facility for his back pain. For the same reasons discussed above, this contention does not save Plaintiff's claim against Dr. Larson. The record evinces that Dr. Larson treated Plaintiff's back pain in the way he believed to be best, and at most, his course of treatment may have differed from that of another physician at a different facility during a different time period. "Whether a double mattress permit in combination with prescription drug treatment (or some other form of treatment altogether) is indicated is a classic example of a matter for medical judgment." *Morris v. Trost*, No. 17-CV-01166-JPG, 2020 WL 1529519, at *4 (S.D. Ill. Mar. 31, 2020) (internal quotation marks and citations omitted). "Inmates are not entitled to demand specific treatment or to the best care possible." *Id.*

      c.   *Plaintiff's Eye Treatment*

Plaintiff also alleges that Dr. Larson was deliberately indifferent to his serious eye conditions by refusing to issue a medical permit for two pillows (*see generally* Doc. 144-1).[6] In response, Dr. Larson argues that: (1) the optometry clinic was primarily responsible for Plaintiff's eye care, and (2) to the extent that he did treat Plaintiff's eye condition, he

---

[6] For purposes of this Order, the Court also assumes – without actually reaching a decision on the issue – that Plaintiff's eye condition constituted an objectively serious medical condition.

offered reasonable care and was not deliberately indifferent (Doc. 140 at pp. 17-19).[7] The Court again agrees with Dr. Larson.

The evidence establishes that Dr. Larson was not directly responsible for Plaintiff's eye care (Doc. 140-1 at p. 2). Rather, vision care is provided by optometrists at Big Muddy (*Id.*). Furthermore, while Dr. Larson was not responsible for the majority of Plaintiff's eyecare, Dr. Larson still reviewed Plaintiff's vision records and determined he did not demonstrate a need for a double pillow permit (*Id.* at p. 7). Additionally, Dr. Larson issued a medical permit for Plaintiff to obtain tinted sunglasses which were medically recommended (*Id.*).

Plaintiff has failed to present evidence demonstrating that Dr. Larson was deliberately indifferent to his serious medical condition related to his eyes. Instead, the evidence presented demonstrates that, to the extent Dr. Larson was even responsible for Plaintiff's eye care, he provided appropriate treatment to Plaintiff (*Id.*). Furthermore, Plaintiff's claim that he was previously issued a double pillow permit after his cataract surgery does not support his claim that Dr. Larson was deliberately indifferent by failing to issue a similar permit years later. As with Plaintiff's other medical conditions and permit requests, Plaintiff was not entitled to a double pillow permit because he subjectively believed it to be beneficial based upon his treatment history. Plaintiff "did not submit evidence from which a jury reasonably could find that [the doctor's] exercise

---

[7] Dr. Larson also contends that Plaintiff has not suffered any harm by his refusal to issue a double pillow permit (Doc. 140 at p. 19). The Court declines to address this issue because Dr. Larson's other argument is outcome determinative.

of medical judgment departed significantly from accepted professional norms." *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014). *See also Williams*, 43 F. App'x at 966 ("Although Williams contends that this decision caused him harm, his mere disagreement with Hartz's medical judgment cannot sustain a claim of deliberate indifference.").

Accordingly, because Plaintiff has failed to present evidence sufficient to establish Dr. Larson's deliberate indifference as to any of his medical conditions at issue in this action, Dr. Larson is entitled to summary judgment. *See Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022) ("A party who fails to produce evidence sufficient to establish an element essential to that party's case on which they bear the burden of proof cannot survive a summary judgment challenge."). Dr. Larson's motion for summary judgment is GRANTED and Dr. Larson is DISMISSED with prejudice.

III.    The Parties' Supplemental Motions (Docs. 137, 148, 149, 156, 160, 161)

Finally, both parties have filed additional motions related to Dr. Larson's summary judgment motion or the progress of this case. In consideration of the Court's above ruling granting Dr. Larson's motion for summary judgment, the Court DENIES as MOOT Plaintiff's motion for settlement conference (Doc. 137); Dr. Larson's motion to strike (Doc. 148); and Plaintiff's motion for status as to Dr. Larson's motion for summary judgment (Doc. 161).

Furthermore, the Court DENIES as MOOT Plaintiff's motion to have witness called to testify (Doc. 149) and related motion for status (Doc. 160). In addition to being filed after the close of discovery (*see* Doc. 113), the Court notes that having an inmate-witness testify that he received a double mattress permit after arriving at Big Muddy has

no bearing on whether Dr. Larson was deliberately indifferent by failing to issue a similar permit to Plaintiff. Put simply, testimony that a different inmate received a double mattress permit due to that inmate's own unique medical situation does not provide any support for Plaintiff's claim that he was also entitled to such a permit based upon his own medical conditions and circumstances.

Lastly, Plaintiff's motion for status regarding the settlement between him and Defendant Hughes is DENIED as MOOT (Doc. 156) in light of Plaintiff's subsequent filing which states that he received a check for the full amount of the settlement payment with Defendant Hughes (Doc. 159). Consequently, Defendant Hughes is DISMISSED with prejudice.

## CONCLUSION

For the reasons outlined above, Dr. Larson's motion for summary judgment is GRANTED (Doc. 139). Additionally, the other pending motions in this case are DENIED as MOOT. (Docs. 137, 148, 149, 156, 160, 161). Accordingly, both Defendants Dr. Larson and Hughes are **DISMISSED with prejudice** and therefore, this case is likewise **DISMISSED with prejudice.**

The Clerk of Court is directed to enter judgment and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED:  November 6, 2024**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**

## NOTICE

Plaintiff is advised that this is a final decision ending his case in this Court. If Plaintiff wishes to contest this decision, he has two options: he can ask the undersigned to reconsider the Order or he can appeal to the Seventh Circuit.

If Plaintiff chooses to go straight to the Seventh Circuit, he must file a notice of appeal in the district court *within 30 days* from the entry of judgment. FED. R. APP. P. 4(a)(1)(A). The deadline can be extended for a short time only if Plaintiff files a motion showing excusable neglect or good cause for missing the deadline and asking for an extension of time. FED. R. APP. P. 4(a)(5)(A), (C). *See also Sherman v. Quinn*, 668 F.3d 421, 425 (7th Cir. 2012) (explaining the good cause and excusable neglect standards); *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 807 (7th Cir. 2011) (explaining the excusable neglect standard). The current cost of filing an appeal with the Seventh Circuit is $505.00. The filing fee is due at the time the notice of appeal is filed. FED. R. APP. P. 3(e). If Plaintiff cannot afford to pay the entire filing fee up front, he must file a motion for leave to appeal *in forma pauperis* ("IFP motion") along with a recent statement for his prison trust fund account. *See* FED. R. APP. P. 24(a)(1)(C). The IFP motion must set forth the issues Plaintiff plans to present on appeal. *See* FED. R. APP. P. 24(a)(1)(C).

On the other hand, if Plaintiff wants to start with the undersigned, he can file a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), but such a motion is not required to preserve his appellate rights. Any Rule 59(e) motion *must* be filed within twenty-eight (28) days of the entry of judgment. FED. R. CIV. P. 59(e), and the deadline *cannot* be extended. *See* FED. R. CIV. P. 6(b)(2). Any motion must also comply

with Rule 7(b)(1) and state with sufficient particularity the reason(s) that the Court should reconsider the judgment. *Talano v. Nw. Med. Faculty Found., Inc.*, 273 F.3d 757, 760 (7th Cir. 2001). *See also Elustra v. Mineo*, 595 F.3d 699, 707 (7th Cir. 2010) ("This court has held that otherwise timely skeletal motions that fail to satisfy the requirements of FED. R. CIV. P. 7(b)(1) do not postpone the 30–day period for filing a notice of appeal . . . .").

So long as the Rule 59(e) motion is in proper form and filed no later than 28 days after the judgment is entered, the 30-day clock for filing a notice of appeal will be stopped. FED. R. APP. P. 4(a)(4). The clock will start anew once the motion is ruled on. FED. R. APP. P. 4(a)(1)(A), (a)(4), (a)(4)(B)(ii). To be clear, if the Rule 59(e) motion is filed outside the 28-day deadline or "completely devoid of substance," the motion will not stop the clock for filing a notice of appeal, and the clock will expire 30 days from the entry of judgment. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014); *Talano v. Northwestern Medical Faculty Foundation, Inc.*, 273 F.3d 757, 760–61 (7th Cir. 2001); *Martinez v. Trainor,* 556 F.2d 818, 819–20 (7th Cir. 1977). Again, the deadline for filing a notice of appeal can be extended only on a written motion by Plaintiff showing excusable neglect or good cause.